### DENNIS v. SLYMAN.

1. EXCHANGE OF PROPERTY—FRAUD—EVIDENCE—SUFFICIENCY.
    In a suit to rescind a contract for the exchange of property on the ground that plaintiff was defrauded by misrepresentation as to the amount of incumbrance on the property he received, evidence *held*, insufficient to establish his claim.

2. SAME—CONTRACTS—RESCISSION.
    A contract in writing which plaintiff signed after hearing the same read and announcing himself satisfied therewith, will not be set aside on his claim that he was misled as to its contents, unless some very good reason exists for so doing.

3. SAME—FRAUD—EQUITY—ADEQUATE REMEDY AT LAW.
    That defendant failed to put up a deposit or bond to protect plaintiff in his share of certain crops that he was to receive as part of the consideration in the exchange of property, is insufficient ground for rescission of the contract of exchange on the ground of fraud; plaintiff's remedy being in an action at law.

4. SAME—FRAUD—EQUITY—FUTURE PROMISE — ADEQUATE REMEDY AT LAW.

Where plaintiff received from defendant personal property in the exchange subject to a chattel mortgage, the failure of the mortgagee to keep his promise to plaintiff to protect him from foreclosure thereof for one year, *held*, insufficient ground for rescission of the contract of exchange on the ground of fraud, it being simply a promise to do something in the future, and liability thereunder can be settled in an action at law.

Appeal from Macomb; Chester (Guy M.), J., presiding. Submitted June 7, 1921. (Docket No. 7.) Decided October 13, 1921.

Bill by Hiram Dennis against Mohammed E. Slyman and others to rescind an exchange of real and personal property on the ground of fraud. From a decree for plaintiff against defendant Slyman, he appeals. Reversed, and bill dismissed.

*Lynn M. Johnston* (*Warren S. Stone,* of counsel), for plaintiff.

*Andrew L. Moore,* for appellant.

BIRD, J. In the year 1918, defendant Mohammed E. Slyman was a farmer, living upon a farm of 120 acres in the township of Shelby, Macomb county. He did not have title to the farm. He had a contract with defendants Lungerhausen and Hosner to purchase it. There was due upon the contract $6,900. Defendant Slyman had personal property by way of live stock, tools, team and crops on the farm, variously estimated up to $6,000 in value, upon which defendants Lungerhausen and Hosner held a chattel mortgage for $3,300. He also had an arrangement with Lungerhausen and Hosner that when he paid the $3,300 they would release the chattel mortgage and would assign to him

their land contract to the farm which had been given them by the Washington bank. The Washington bank held the title to the farm and had sold it upon a land contract to Lungerhausen and Hosner. Defendant Slyman, being in the situation of owing $6,900 on the farm and $3,300 on his personal property, concluded in the fall of 1918 that he would· like to sell out or make a change. He listed his property for sale with Craig, of Pontiac, a real estate broker.

At this same time plaintiff, Dennis, was the owner of a house and lot in the city of Pontiac. He and his son-in-law wanted to go farming. He listed his house for sale or trade with Mr. Houck, another Pontiac real estate dealer. These two brokers brought plaintiff, Dennis, and defendant Slyman together. Slyman and Dennis examined each other's property, talked the matter over and agreed, as they thought, upon a basis for a trade. They then went to the law office of Peter B. Bromley, of Pontiac, and stated to him the terms of their agreement. Mr. Bromley reduced it to writing. With the omission of some of the immaterial parts, it reads as follows:

"The first party agrees to convey to the said second parties the following property in exchange for the property of the second parties hereinafter mentioned, towit: A farm of 120 acres in Shelby township, Macomb county, Michigan, known as the Slyman farm, subject to a mortgage of $6,900, but he is to pay all interest on the same to the date of the consummation of deal; also the following personal property, towit (Then follows a recital of the personal property): also all my one-fourth interest in all crops now growing on the 130-acre farm of one Disk in said town, except the crop of oats, the said personal property is subject to a chattel mortgage of $3,300, which the second parties assume, but the first party agrees to pay all unpaid interest on said amount up to the time this deal is closed. * * *

"The said parties of the second part, in exchange for the said property of the party of the first part,

agree to sell and convey to said first party the following property, towit:  A house and lot owned by them, being No. 186 Perry street, in the city of Pontiac, Michigan, free and clear, but said first party may place a mortgage on said property of $3,000, but first party agrees to give back to second party a second mortgage of $1,000 on the said property now owned by parties of the second part in the city of Pontiac, Michigan, due on or before one year, with interest at the rate of six per cent

"It is further agreed that each party shall make good and sufficient conveyance of his or her property, and furnish an abstract' of title showing a good merchantable title thereto, and subject only to the incumbrances herein mentioned, said conveyances to be made within five days."   *   *   *

Following this a deed of the Pontiac house and lot was drawn to Slyman.  He, in turn, gave back a mortgage to Dennis for $1,000, in accordance with the agreement.  Other papers were then drawn and signed by Lungerhausen and Hosner and Slyman and Dennis, by which Lungerhausen and Hosner agreed to relieve Slyman of his personal obligations and substitute Dennis in his place, and Dennis agreed to pay the same.  Soon after the papers were made Dennis moved onto the farm and Slyman moved to Pontiac. Dennis had not lived on the farm long before he learned of a chattel mortgage on the personal property owned by one McCafferty.  Being pressed for payment he paid $164 thereon.  Later the mortgage was foreclosed and the property sold to satisfy McCafferty's claim for $876.  Defendants insist, and it does not appear to be disputed, that the McCafferty mortgage was included in the Lungerhausen and Hosner mortgage for $3,300, and that Lungerhausen and Hosner agreed with Dennis to give him one year in which to make payment of said mortgage.  Plaintiff claims he left after learning from a neighbor that the farm was subject to a claim of $6,900.  He claims

he thought he was trading his house and lot for the farm and that all the indebtedness he assumed was the $3,300 on the personal property.   His claim is that Slyman misrepresented the state of the title and said nothing about the $6,900, and that he was thereby defrauded.   He filed this bill for a rescission of the agreement and the court granted it and placed the parties back in the position which they were in except the $3,000 mortgage which Slyman had given to Malcolm on the Pontiac property after acquiring title thereto.   The court held this mortgage valid and gave a decree against Slyman for the amount and made it a lien upon whatever interest he, Slyman, had in the farm.

1. It is a strain upon our credulity to accept as true the statement of plaintiff that he did not know he was buying the farm subject to a claim of $6,900. He and Slyman talked over their deal and agreed, as they thought, upon a basis for a trade.   They went to the law office of Peter B. Bromley, an attorney, and advised him what their agreement was, and he reduced it to writing.   When he had finished he read it over to them and they approved and signed it.   This agreement expressly provides that plaintiff takes the farm "subject to a mortgage of $6,900."   The matter did not end here.   This agreement was carried out. Plaintiff and Slyman went to Lungerhausen and Hosner and arrangements were made whereby Dennis should take over the interest of Slyman and become the debtor of Lungerhausen and Hosner as to the personal property, and they promised in writing that when the $3,300 was paid they would release the chattel mortgage and assign to plaintiff the land contract of the farm.   Mr. Lungerhausen testified that when plaintiff and Slyman called on him with reference to the matter,

"We talked about what claims were against the

personal property and against the real estate. I went to the safe and got my contract and the other papers and read them to the parties; I told them there was $6,900 against the farm and approximately $3,300 against the personal property which would be $10,200 which would have to be paid before the property was clear."

The first time plaintiff and Slyman called upon Mr. Lungerhausen he was not at home and his son, John, who is an attorney, talked with them. He explained to them that there was $6,900 due on the real estate and $3,300 on the personal property.

Homer H. Colvin, an attorney, who drew some of the papers, testified that he heard plaintiff and Slyman talking about the incumbrances on the farm and personal property. Daniel Houck, the real estate broker who figured in the deal, testified he heard Slyman tell plaintiff that there was an indebtedness on the farm of $6,900.

When one makes an agreement and puts it in writing and it is afterwards read over to him and he signs it, some attention ought to be paid to it, and its provisions ought not to be frittered away or set aside unless some very good reason exists for so doing. It is said Mr. Dennis could not read or write English, and the same claim is made for Mr. Slyman. We fail to see how this can alter the situation. Plaintiff and Slyman agreed upon something before they went to Mr. Bromley's office. They told Mr. Bromley what they had agreed upon. The only information he had when he drew the agreement was the information which he had gotten from them. They were both present and after the agreement was made Mr. Bromley read it over to them and they announced themselves satisfied and signed it.

The respective values of the properties were gone into at some length at the hearing. These tend to show that plaintiff understood that he was buying the

farm subject to the claim of $6,900. The testimony shows that the farm was fairly worth $11,000 or $12,000; that the house and lot was worth between $6,000 and $7,000. Calling the house and lot worth $7,000, and deducting the $1,000 mortgage given back to plaintiff, leaves a value of $6,000. Just how plaintiff thought he was going to purchase a farm worth $11,000 or $12,000 with $6,000 is not quite clear to us. If we call the farm worth $12,000 and the personal property worth $3,300, then plaintiff received $15,300 in property. Deducting therefrom the amount due on the real estate, $6,900, plus $3,300 on the personal property, leaves a balance of $5,100 to be paid by a conveyance of the house and lot. Calling the house and lot worth $6,000 and deducting the $1,000 mortgage given to plaintiff would leave $5,000 to take care of this $5,100 balance. These figures are persuasive that plaintiff understood he was buying the farm subject to the claim against it of $6,900. The latter figures are within the range of the testimony and are more consistent than the claim of plaintiff that he was trading the $7,000 house subject to a mortgage of $1,000 for a farm fairly worth $11,000 or $12,000.

2. There is no disagreement as to the consideration which was to be paid for the personal property. Plaintiff was to pay $3,300 and that was to include the McCafferty chattel mortgage. Lungerhausen and Hosner gave plaintiff one year to pay it. Before the year expired the McCafferty mortgage was foreclosed and the whole amount of personal property was sacrificed in payment of the mortgage. The record does not show that plaintiff, Lungerhausen or Hosner, made any effort to protect the property against sale. In the event that Lungerhausen and Hosner have not kept faith with Slyman, they can settle their differences in an action at law.

3. In 1918 Slyman worked an adjoining farm of

130 acres. Included in this transfer to plaintiff was his interest in the crops on the 130 acres. To secure this Slyman was to put up a deposit or a bond of $400 in the bank. Slyman did not do this and his interest in the crops amounted to nothing after the landlord had gotten his pay. If Slyman is liable to plaintiff on this phase of the transaction he has his remedy at law to right it.

4. We are of the opinion that plaintiff understood that he was buying the farm subject to the claim of $6,900, and that he understood he was buying the personal property subject to a chattel mortgage of $3,300. His agreement in writing shows this and is corroborated by the surrounding circumstances. It is true Lungerhausen and Hosner did not protect him as they agreed to do with reference to the chattel mortgage. Neither did Slyman with reference to the crops on the rented farm, but these failures could not be used as a basis for an action of fraud. They were simply promises to do something in the future. Whether the bargain was a good or bad one we do not know and with that question we are not greatly concerned. Having made the bargain in writing and having voluntarily attested it by his signature, the plaintiff should be held to its terms even though he suffers loss by reason of it.

The decree is reversed and plaintiff's bill is dismissed, with costs to defendant Slyman.

STEERE, C. J., and MOORE, WIEST, FELLOWS, STONE, CLARK, and SHARPE, JJ., concurred.